UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOURTHERN DIVISION

| | |
|---|---|
| ISAAC INDUSTRIES, INC., on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| BASF CORPORATION; BASF SE; COVESTRO, AG; COVESTRO, LLC; THE DOW CHEMICAL COMPANY; HUNTSMAN INTERNATIONAL LLC; WANHUA CHEMICAL GROUP CO., LTD., and WANHUA CHEMICAL (AMERICA), LTD., | **<u>JURY TRIAL DEMANDED</u>** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

1.   Nature of the case. ..................................................................................1

2.   Jurisdiction and venue. ...........................................................................2

3.   Definitions. ............................................................................................3

4.   Parties.....................................................................................................3

  4.1   Plaintiff. .......................................................................................3

  4.2   Defendants. ...................................................................................4

5.   Co-conspirators. .....................................................................................7

6.   Class action allegations. ........................................................................8

7.   Trade and interstate commerce.............................................................11

8.   The Diisocyanates market. ...................................................................11

  8.1   What is MDI? ..............................................................................11

  8.2   What is TDI? ...............................................................................13

  8.3   The manufacture of MDI.............................................................14

  8.4   The manufacture of TDI..............................................................17

  8.5   There are numerous Diisocyanates market characteristics evidencing a price-fixing conspiracy......................................................................18

    8.5.1   The pricing of Diisocyanates indicates the existence of a price-fixing conspiracy......................................................................18

    8.5.2   The structure and characteristics of the Diisocyanates market render the alleged conspiracy more plausible..........................22

    8.5.3   Diisocyanates are commodity products. ..................................23

    8.5.4   The Diisocyanates market has high barriers to entry...............23

    8.5.5   The Diisocyanates market is highly concentrated. ..................24

8.5.6   There is a U.S. DOJ criminal investigation into the MDI market ........................................................................ 26

8.5.7   The defendants have a history of anti-competitive behavior, including with respect to Diisocyantes. ................................. 28

8.5.8   The Defendants belong to and attended trade association meetings which provided them an opportunity to conspire ...... 29

9.     Effects ................................................................................................ 31

10.    Fraudulent concealment ................................................................... 31

11.    Cause of action. Violation of Section One of The Sherman Act (On behalf of Plaintiff and Class) ...................................................... 34

Prayer for relief. ........................................................................................ 36

Jury trial demand ....................................................................................... 37

Plaintiff Isaac Industries, Inc. ("*Plaintiff*"), individually and on behalf of a class of all those similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a trial by jury.

## 1.    Nature of the case.

1.     Plaintiff alleges a conspiracy among Defendants and certain unnamed co-conspirators to fix, raise, maintain or stabilize prices and to allocate customers and markets for two critical and related chemicals used to manufacture foam — methylene diphenyl diisocyanate or MDI and toluene diisocyanate or TDI. Collectively, these chemicals are referred to in this complaint as *Diisocyanates*. In the earlier part of this decade, the prices of Diisocyanates experienced a period of relative stability with minimal fluctuation of price. Then, during the time period relevant to this complaint, the prices of Diisocyanates embarked on a vertiginous ascent. These price increases cannot be explained by increases in the prices of raw materials, energy, or any other potentially legitimate factors. Instead, the cause of the dramatic Diisocyanates price increases is the Defendants' unlawful price-fixing conspiracy alleged in this complaint.

2.     Plaintiff brings this action on behalf of itself and all individuals and entities that purchased Diisocyanates in the United States and its territories directly from Defendants from January 1, 2015 through the present (the "Class Period"). At

all relevant times, Defendants manufactured and sold Diisocyanates.[1] During the Class Period, Defendants and their co-conspirators agreed, combined, and conspired with each other to fix, raise, maintain or stabilize prices and to allocate customers and markets for Diisocyanates sold in the United States. As a result of Defendants' unlawful conduct, Plaintiff and the Class (as defined in this Complaint) paid artificially inflated prices for Diisocyanates, and therefore have suffered injury to their business and property.

## 2.    Jurisdiction and venue.

3.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

5.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391 (b), (c) and (d) because during the Class Period the Defendants resided, transacted business, were

---

[1]    As further explained below, Huntsman did not sell TDI during the relevant period.

found, or had agents in that District, and because a substantial portion of the affected interstate trade and commerce described herein is and has been carried out in that District.

### 3.   Definitions.

6.     MDI, as used in this complaint, means monomeric or polymeric diphenylmethane diisocyanate, methylene bisphenyl isocyanate, methylene diphenyl diisocyanate or methylene bis (p-phenyl isocyanate).

7.     MDI is a type of isocyanate used in combination with polyether polyols as a raw material for the production of rigid insulation foams and structural foams, among other applications.

8.     TDI as used in this complaint means toluene diisocyanate or tolylenediisocyanate.

9.     TDI is another type of isocyanate used in combination with polyether polyols as a raw material for the production of flexible foams for furniture, mattresses, packaging foam, and automobile seating, among other applications.

### 4.   Parties.

**4.1   Plaintiff.**

10.     Plaintiff Isaac Industries, Inc. is a Florida corporation with its principal place of business in Miami, Florida. Isaac purchased MDI and TDI in the United States directly from one or more of the Defendants during the Class Period, and has been damaged in its business or property by having to pay artificially

inflated prices for Diisocyanates resulting from Defendants' conduct alleged in this complaint.

**4.2    Defendants.**

11.    Defendant Covestro AG is a German corporation with its principal place of business in Leverkusen, Germany. Covestro AG was formerly known as Bayer MaterialScience, and a wholly owned subsidiary of Bayer AG. In 2015, Bayer AG spun off Bayer MaterialScience, and the entity spun-off was renamed Covestro. Covestro AG has extensive operations in the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Covestro AG manufactured and sold MDI and TDI to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.

12.    Defendant Covestro LLC is a Delaware limited liability corporation with its principal place of business in Pittsburgh, Pennsylvania. Covestro LLC is wholly-owned by defendant Covestro AG. During the Class Period, Covestro LLC manufactured and sold MDI and TDI to purchasers in the United States and elsewhere. Covestro AG controls Covestro LLC both generally and with respect to the conduct of Covestro LLC in furtherance of the unlawful acts alleged in this complaint. Covestro AG and Covestro LLC are collectively referred to in this complaint as *Covestro*.

- 4 -

13.     Defendant BASF SE is a German corporation with its principal place of business in Ludwigshafen, Germany. BASF SE has extensive operations in the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. BASF SE manufactures MDI at plants located in Geismar, Louisiana; Antwerp, Belgium; Shanghai, China; Chongqing, China; and Yeosu, South Korea. During the Class Period, BASF SE manufactured and sold MDI and TDI to purchasers in the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries. BASF SE sells its MDI and TDI through its Chemicals division.

14.     Defendant BASF Corporation (*BASF Corp.*) is a Delaware corporation with its principal place of business in Florham Park, New Jersey. During the Class Period, BASF Corp. manufactured and sold MDI and TDI to purchasers in the United States and elsewhere. BASF Corp. is the North American affiliate of BASF SE. BASF SE controls BASF Corp. both generally and with respect to the conduct of BASF Corp. in furtherance of the unlawful acts alleged in this complaint. BASF SE and BASF Corp. are collectively referred to as *BASF* in this complaint.

15.     Defendant the Dow Chemical Company (*Dow*) is a Delaware corporation with its principal place of business in Midland, Michigan. Dow is a wholly-owned subsidiary of DowDupont, Inc. DowDupont, Inc. controls Dow both

generally and with respect to the conduct of Dow in furtherance of the unlawful acts alleged in this complaint. Dow sells several different types of MDI under product lines such as ISONATE, PAPI, VORANATE, SPECTRIM and SPECFLEX. Dow sells several different types of TDI under product a line named VORANATE. During the Class Period, Dow manufactured and sold MDI and TDI to purchasers in the United States and elsewhere.

16.     Defendant Huntsman International LLC (*Huntsman*) is a Delaware corporation with its principal place of business in The Woodlands, Texas. Defendant Huntsman, is a wholly-owned subsidiary of Huntsman Corporation, a publicly-traded company. Like BASF SE, Huntsman manufactures MDI at a plant in Geismar, Louisiana. During the Class Period, Huntsman manufactured and sold MDI to purchasers in the United States and elsewhere. Huntsman produced TDI until approximately July 2005, at which time it sold its TDI business to defendant BASF.

17.     Defendant Wanhua Chemical Group Co., LTD. (*Wanhua Chemical Group*) is a publicly-traded Chinese company, based in Yantai, China, Shangdong Province. Wanhua Chemical Group has extensive operations in the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, *Wanhua Chemical Group* manufactured and

sold MDI and TDI to purchasers in the United States and elsewhere, directly or through its predecessors, affiliates and/or subsidiaries.

18.    Defendant Wanhua Chemical (America) Ltd. f/k/a Yantai Wanhua America Co. Ltd. (*Wanhua Chemical America*) is a Nevada corporation with its principal place of business in Newton Square, Pennsylvania. Wanhua Chemical America is a wholly-owned subsidiary of Wanhua Chemical Group. In early 2017, Wanhua Chemical America announced plans to build a massive MDI plant in Louisiana, at a cost of $1.12 billion.[2] Wanhua touts itself as the largest MDI supplier, by capacity, in the world.[3] During the Class Period, Wanhua Chemical America manufactured and sold MDI and TDI to purchasers in the United States and elsewhere. In this complaint, Wanhua Chemical Group and Wanhua will be collectively referred to as *Wanhua*.

### 5.    Co-conspirators.

19.    Various other persons, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

---

[2]

https://www.nola.com/business/index.ssf/2017/04/chinas_wanhua_chemical_to_buil.html (last visited June 25, 2018) (Exhibit 1).

[3] *Id.*

20.     Whenever in this complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

### 6.     Class action allegations.

21.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons and entities who purchased Diisocyanates directly from a Defendant at any time from January 1, 2015 through the present in the United States and its territories or for delivery in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates)(*Class*).

22.     Plaintiff does not know the exact number of class members because such information is in the Defendants' exclusive control. But due to the nature of the trade and commerce involved, Plaintiff believes that there are hundreds of Class members as above described, the exact number and their identities being known by Defendants.

23.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

24.   There are questions of law and fact common to the Class, including:

   a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices of Diisocyanates sold in the United States;

   b.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the market for Diisocyanates sold in the United States;

   c.   The identity of the participants of the alleged conspiracy;

   d.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

   e.   Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

   f.   Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

   g.   The effect of the alleged conspiracy on the prices of Diisocyanates sold in the United States during the Class Period;

   h.   Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the other members of the Class; and

   i.   The appropriate class-wide measure of damages.

25.   Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a direct purchaser of MDI and TDI, and its

interests are coincident with, and not antagonistic to, those of the other members of the Class.

26.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class-action litigation.

27.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

28.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

### 7.    Trade and interstate commerce.

30.    The activities of Defendants and their co-conspirators, as described in this complaint, were within the flow of and substantially affected interstate commerce.

31.    During the Class Period, Defendants and their co-conspirators, manufactured, sold and shipped substantial quantities of Diisocyanates, in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced these products. In addition, the primary raw materials used to manufacture Diisocyanates were purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

32.    The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

### 8.    The Diisocyanates market.

### 8.1    What is MDI?

33.    MDI is a chemical used in the production of polyurethanes for many applications. According to the American Chemistry Council, "MDI is used primarily in the production of rigid polyurethane foams used for insulation for your home or refrigerator, and many other uses. Insulation made with MDI can help consumers save on their heating and cooling costs and conserve energy. Some

additional uses of MDI in polyurethanes include coatings, adhesives, sealants, and elastomers found in items such as paints, glues, and weather resistant materials. It is also used to make many types of footwear, sports and leisure products and to a much lesser extent, some specialty flexible foams. MDI can also be used as a binder for wood and to produce mold cores for the foundry industry."[4]

34.     Rigid foam is approximately 51-52% MDI by average weight. The largest rigid foam end-market is the construction industry, accounting for approximately 60% of rigid foam made from MDI. From a technical perspective, MDI is obtained from the condensation of aniline with formaldehyde to produce methylene dianiline (MDA), which is in turn reacted with phosgene to form MDI.[5]

35.     Diisocyanate generally come in two forms: aromatic and aliphatic. There are two primary aromatic diisocyanates: TDI and MDI. MDI, the second type of diisocyanate, comes in two forms: pure MDI and polymeric MDI (*PMDI*). Pure MDI is used in the production of a variety of polyurethane products like elastomers, sealants, adhesives and coatings. PMDI is a highly versatile product used to produce a wide variety of rigid, flexible, semi-rigid and polyisocyanurate

---

[4]     https://dii.americanchemistry.com/Diisocyanates-Explained/. (last visited June 25, 2018) (Exhibit 2).

[5]     *Id.*

and thermoset foams.[6] Together, MDI and TDI comprise nearly 100% of all diisocyanates produced worldwide.

36.    The following depicts the chemical structure of MDI (as well as TDI).



*Figure 1: Aromatic diisocyanates*

## 8.2    What is TDI?

37.    According to the American Chemistry Council, "[t]oluene diisocyanate (TDI) is a chemical used in the production of polyurethanes, primarily for flexible foam applications including furniture, bedding and carpet underlay, as well as packaging applications. TDI is also used in the manufacture of coatings, sealants, adhesives and elastomers. In transportation applications, TDI helps produce lighter automobile parts, saving weight, which leads to improvements in fuel efficiency and thus energy conservation."[7] Further, from a technical perspective, TDI is obtained by nitration of toluene. The hydrogenation of

---

[6]    *Id.*

[7]    https://dii.americanchemistry.com/Diisocyanates-Explained/ (last visited July 1, 2018) (Exhibit 3).

dinitrotoluene is then obtained to produce toluenediamine (TDA), which is in turn reacted with phosgene to form TDI.[8]

**8.3    The manufacture of MDI.**

38.    The following chart depicts the production flow of MDI.[9]

---

[8]    *Id.*

[9]    Source: *Eco-profiles of the European Plastics Industry, Tolylene diisocyanate (TDI)*, Plastics Europe, dated March 2005, at p. 8.



Figure 4
Schematic diagram showing the principal operations leading to the production of MDI.
* Note that hydrogen can be produced by a variety of different methods; e.g. from the electrolysis of sodium chloride, as a by-product in hydrocarbon cracking, etc.

39.     The materials in the top of the chart are the feedstock or input materials that go into the manufacture of MDI. These feedstock materials combine

to form MDI which in turn is distilled to form "pure" and polymeric forms. Due to the high reactivity of the feedstock materials, all of these materials must be handled with care and in facilities designed to minimize exposure to harsh chemicals.

## 8.4    The manufacture of TDI.

40.    The following chart depicts the production of TDI.[10]



Figure 5
Schematic diagram showing the principal operations leading to the production of TDI.
* Note that hydrogen can be produced by a variety of processes; e.g. during the electrolysis
of sodium hydroxide, as a by-product in hydrocarbon cracking, etc.

---

[10]   *Id.*

**8.5** **There are numerous Diisocyanates market characteristics evidencing a price-fixing conspiracy.**

**8.5.1** **The pricing of Diisocyanates indicates the existence of a price-fixing conspiracy.**

41. The Defendants' recent Diisocyanates pricing supports the existence of the price-fixing conspiracy alleged in this complaint.

42. During the last four years, the price of Diisocyanates sold by all Defendants has risen dramatically.

43. MDI pricing experienced a period of relative stability during the latter part of the previous decade, and the earlier part of the current decade. During that period of relatively stability (a period spanning nearly 10 years), the price of MDI fluctuated between approximately $2300/ton to $3000/ton. However, in or around 2015, the price of MDI began to decline. Shortly after the decline began, the price then began a dramatic ascent. Since 2015, the price of MDI has doubled, rising from nearly $2350/ton to over $4500/ton.

44. TDI pricing has experienced an almost identical pattern. Similarly experiencing a period of relative stability during the earlier part of the decade. During that period, the price of TDI ranged from approximately $2950/ton to $3350/ton. However, in or around 2015, the price of TDI began to decline. Shortly after the decline began, the price then began a dramatic ascent. Since 2015, the

price of TDI has more than doubled, rising from nearly $2450/ton to over $5300/ton.

45.    There is no legitimate explanation for these price increases. Defendants have tried to justify these massive price hikes on increased raw material and production costs. Changes in the price of raw materials for these products, which are the principal cost of manufacturing these products, however, don't even begin to explain the announced increases in the prices for Diisocyanates.

46.    One of the primary inputs into the production of MDI and TDI is energy. In connection with the MDI and TDI price increases, Defendants often touted increases in energy costs as necessitating price increases for MDI and TDI. Yet, actual energy costs have remained relatively stable for nearly a decade. The following figure depicts the Henry Hub Natural Gas Spot Price.[11]

---

[11]   The Henry Hub is a natural gas pipeline located in Erath, Louisiana, and is the official delivery location for gas futures contracts on the NY Mercantile Exchange. https://www.investopedia.com/terms/h/henry_hub.asp. It is considered an indicator of natural gas spot prices. (Exhibit 4)



47.    As can be seen, the price of natural gas has remained relatively stable

since 2014, and, has actually dropped during the period of Defendants' price hikes

for Diisocyanates. Thus, increasing energy prices do not justify the Defendants'

hikes in Diisocyanates pricing.

48.    Increases in the prices of propylene have also been cited by

Defendants as a reason for Diisocyanates price increases. For example, a previous

news article on Dow's foam production states: "The rising price of propylene and

natural gas (over $5 per million BTU) makes the production of propylene oxide, a

major raw material used in the manufacture of polyols, more expensive. The

increased cost to produce polyurethane materials is fundamental to Dow's urgent

need for margin recovery."

49.    The chart below is a production chart for rigid polyurethane. As

shown, propylene is a required feedstock chemical for MDI's largest end-use

product, rigid polyurethane foam. The price of propylene affects the volume of

- 20 -

foam produced, which in turn affects the demand of MDI. If the price of propylene

increases, the volume of polyurethane produced may decline and/or polyurethane

prices may increase, and MDI production/price may be subsequently affected.



Source (ALL): Deutsche Bank, SRI, CMAI, ICIS, Tecnon/OrbiChem, Chemical Market Reporter, company data
% of global capacity = expansion/estimated global capacity and end of prior year

50.     The chart below displays the historical prices of propylene, from

December 2000 through June 2018:

:



Source: Source: Last Price of Generic 1st PGP Polymer Grade Propylene, PGP1 COMB Comodity, 12/17/10 - 6/22/18, Bloomberg LP.

51.     As can be seen, propylene prices dropped precipitously in 2014. Yet, in 2014, Defendants cited rising propylene prices as a key driver of MDI and TDI price increases.

52.     Finally, as can be seen in the production flow chart above, benzene is a key input to the production of MDI (as well as TDI). The Defendants have also used rising benzene prices as a justification for their massive Diisocyanates price increases. However, over the last four years, the price of benzene has been relatively flat, and therefore, cannot justify the Defendants' price increases.

53.     As further evidence that purported rising benzene prices cannot provide Defendants cover for their breathtaking increases in Diisocyanates pricing, the "spread" between benzene prices and Diisocyanates pricing has also increased dramatically over the last four years. In otherwords, the relationship between benzene prices and Diisocyanates pricing has become increasingly less correlated.

### 8.5.2   The structure and characteristics of the Diisocyanates market render the alleged conspiracy more plausible.

54.     In addition to Diisocyanates pricing supporting the existence of a conspiracy, the structure and other characteristics of the Diisocyanates market are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Diisocyanates market: (1) consists of a commodity product; (2) has high barriers to entry; (3) is highly concentrated; (4) the existence of a criminal investigation; (5) the Defendants' history of anti-

competitive behavior regarding the same or similar products; and (6) the existence of trade associations provided forums and opportunities for the Defendants to conspire.

### 8.5.3  Diisocyanates are commodity products.

55.     Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service.

56.     Because Diisocyanates are chemical compounds, they cannot differ from one supplier to another. Thus, the commodity nature of Diisocyanates provides the Diisocyanates industry with the incentive to collectively agree to artificially increase price.

57.     Further, in connection with an earlier litigation involving Diisocyanates (discussed below), the Tenth Circuit, in quoting an expert who testified in then litigation, noted that MDI and TDI are "homogenous" products, which was one factor rending these products "ripe for collusion."[12]

### 8.5.4  The Diisocyanates market has high barriers to entry.

58.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing and profits. Where, however, there are

---

[12]  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1265 (10th Cir. 2014).

significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

59.     There are substantial barriers that preclude, reduce or make more difficult entry into the Diisocyanates market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, transportation distribution infrastructure, skilled labor and long-standing customer relationships. Because of the high reactivity of the chemicals used to manufacture Diisocyanates, Diisocyanates plants must be specifically designed to minimize contact with any input or output chemical. As a result, it costs significantly more to build a Diisocyanates plant, than other chemical plants.

60.     In addition to the large costs of building a plant, given the nature of the materials used in Diisocyanates, any new entrant will be required to comply with various environmental regulations in whatever jurisdiction such plant is built. Compliance with such regulations will require extensive testing and the receipt of government approvals, all of which will take many years.

### 8.5.5  The Diisocyanates market is highly concentrated.

61.     Market concentration facilitates collusion. If an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the

cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully). Conversely, with a more concentrated industry, a greater share for a colluding firm in future cartel profits tips the balance in favor of continued collusion, and away from any short-term, transitory bump in profits that could be achieved by undercutting the cartel price and gaining a transitory increase in market share.

62.     The Herfindahl-Hirschman Index (*HHI*) is a measure of industry concentration that economists often use to quantify the degree of market concentration. The United States Department of Justice considers an HHI value higher than 2500 to be a highly concentrated industry.[13]

63.     Based on publicly available data, the HHI for the U.S. MDI market exceeds 2,600. This demonstrates that the MDI market is highly concentrated. With respect to TDI, the market is even more concentrated, with an HHI of over 5000.

---

[13]   July 29, 2015 United States Department of Justice, Herfindahl Hirschman Index. Retrieved from https://www.justice.gov/atr/herfindahl-hirschman-index. (Exhibit 5).

64.    Again, in connection with earlier antitrust litigation involving Diisocyanates, the Tenth Circuit noted that Diisocyanates production was "concentrated in the hands of a only a handful of firms" making the Diisocyanates industry "ripe for collusion."[14]

### 8.5.6  There is a U.S. DOJ criminal investigation into the MDI market.

65.    In or around June 8, 2018, it was publicly revealed for the first time that the United States Department of Justice is conducting a criminal investigation into the market for MDI. It was reported that MDI producers received grand jury subpoenas at the end of February 2018.  The investigation is being conducted by Washington, D.C.-based prosecutors.

66.    Defendants Covestro and BASF have publicly confirmed they have received grand jury subpoenas. Specifically, in a June statement, a spokesperson for BASF stated, "the U.S. Department of Justice has issued a subpoena to BASF Corporation and several other companies related to an investigation the government is initiating involving producers of MDI and alleged violations of the antitrust laws."[15] Given the close nature of MDI and TDI, and the similarity of the recent prices increases between both products, and the overlap of producers, it is

---

[14]    *Urethanes*, 768 F.3d 1245 at 1265.

[15]    *BASF confirms subpoena in price-fixing investigation of polyurethane ingredient MDI*, Joshua Sisco, mLEX, June 11, 2018.

likely the investigation also relates to TDI (or soon will), although there have been

no public reports confirming this.

67.     It is significant that Defendants' anticompetitive behavior is the

subject of a criminal grand jury investigation being conducted by the Department

of Justice. In order for the DOJ to institute a grand jury investigation, a DOJ

Antitrust Division attorney must believe that a crime has been committed and

prepare a detailed memorandum to that effect.[16] Following a review of that

memorandum, the request for grand a jury must be approved by the Assistant

Attorney General for the Antitrust Division, based on the standard that a criminal

violation may have occurred. In addition, the fact that the DOJ Antirust Division

investigation is criminal, as opposed to civil, is significant as well. The Antitrust

Division's "Standards for Determining Whether to Proceed by Civil or Criminal

Investigation" state: "[i]n general, current Division policy is to proceed by criminal

investigation and prosecution in cases involving horizontal, *per se* unlawful

agreements such as price fixing, bid rigging and horizontal customer and territorial

allocations."[17] Accordingly, the existence of a criminal investigation into the

---

[16]     *See* United States Department of Justice Antitrust Division Manual (Fifth Edition), pp. III-82-84 (available at https://www.justice.gov/atr/file/761166/download) (Exhibit 6).

[17]     See United States Department of Justice Antitrust Division Manual (Fifth Edition), pp. III-12 (available at https://www.justice.gov/atr/file/761166/download) (Exhibit 6).

market for MDI (and possibly TDI) supports the existence of the conspiracy alleged in this complaint.

### 8.5.7  The defendants have a history of anti-competitive behavior, including with respect to Diisocyantes.

68.     The Defendants are no strangers to anti-competitive behavior. In connection with prior misbehavior, Defendants have paid hundreds of millions of dollars in criminal fines and in settlements with their customers. Some of these payments were related to prior wrongdoing with respect to MDI.

69.     In May 2005, Bayer Corporation (the predecessor of Covestro LLC), pleaded guilty to violating the Sherman Act, in connection with its participation in an antitrust conspiracy to raise the prices of polyester polyols (a product also used to manufacture foam). In connection with its guilty plea, Bayer paid $33 million in criminal fines.

70.     In or around 2005, the U.S. Department of Justice began an investigation of Dow, BASF, Bayer and Huntsman for alleged price-fixing with respect to polyether polyols. However, ultimately the DOJ declined to bring criminal charges.

71.     Although the DOJ declined to bring criminal charges, in 2004, private antitrust plaintiffs brought suit (which ultimately became an MDL in the District of Kansas) against Bayer, BASF, Dow, Huntsman and Lyondell, alleging that they fixed prices on polyether polyols, MDI and TDI. Ultimately, the suit yielded nearly

$1 billion in settlements. Plaintiffs went to trial against Dow, and Dow was found guilty of price-fixing by a jury, with the jury awarding more than $1 billion in damages (with trebling).[18]

### 8.5.8  The Defendants belong to and attended trade association meetings which provided them an opportunity to conspire.

72.     The Defendants belong to, and regularly attended meetings of certain trade associations during the Class Period. These trade association meetings provided them cover to meet and discuss the anti-competitive agreements alleged in this complaint. In connection with the prior multi-district litigation involving these products, the Tenth Circuit noted that the Diisocyanates industry "has several trade associations, which provided 'an opportunity to engage in price fixing behavior.'"[19]

73.     The Defendants were members of the American Chemistry Council. The ACC is a trade organization dedicated to the chemicals industry. The American Chemistry Council conducted annual meetings during the relevant period of time, which representatives of the Defendants attended.

---

[18]   Dow appealed the verdict and the case settled on appeal for $835 million. This is one of the largest settlement payments ever by a single defendant in an antitrust case.

[19]   *Urethanes*, 768 F.3d 1245 at 1265.

74.     Further, the ACC is comprised of several specialty groups or panels. The Defendants are members of two relevant panels or groups: the Diisocyanates Panel and the Center for the Polyurethanes Industry (*CPI*). Chartered in 1988, the Diisocyanates Panel sponsors research on methylene diphenyl diisocyanate (MDI) and toluene diisocyanate (TDI), monitors impending regulations, legislation, and other initiatives affecting the production or use of diisocyanates, and develops appropriate responses. According to the ACC website, "the CPI's mission is to promote the growth of the North American polyurethanes industry through effective advocacy, delivery of compelling benefits messages demonstrating how polyurethanes deliver sustainable outcomes, and creation of robust safety education and product stewardship programs."

75.     The Defendants are members of the Diisocyanates Panel[20] and the CPI.[21] In fact, the only members of the Diisocyanates Panel are the Defendants. During the relevant period, there were regular meetings of both the Diisocyanates Panel and the CPI, and at those meetings, Defendants' representatives attended. These meetings provided the forum and opportunity for the Defendants to meet, discuss, and further their unlawful agreement alleged in this complaint.

---

[20]   https://dii.americanchemistry.com/About-Us/ (Last visited July 1, 2018) (Exhibit 7).

[21]   https://polyurethane.americanchemistry.com/CPI-Members/. (Last visited July 1, 2018) (Exhibit 8).

76.     In addition to the ACC, the Defendants also participated in the International Isocyanate Institute (*III*) based in Boonton, NJ. The III hosted meetings during the relevant period of time, which representatives of Defendants attended. These meetings provided the forum and opportunity for the Defendants to meet, discuss, and further their unlawful agreement alleged in this complaint.

### 9.      Effects

77.     The Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

    a.     Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Diisocyanates were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

    b.     Customers and markets of Diisocyanates were allocated among Defendants and their co-conspirators;

    c.     Plaintiffs and the other members of the Class had to pay more for Diisocyanates than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

    d.     Price competition in the sale of Diisocyanates was restrained, suppressed and eliminated in the United States; and

    e.     As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

### 10.     Fraudulent concealment.

78.     Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

79.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Nor could Plaintiff or the Class members have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

80.     Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Diisocyanates, which they affirmatively concealed, at least in the following respects:

      a.    By meeting secretly to discuss prices, and customers and markets, of Diisocyanates sold in the U.S. and elsewhere;

      b.    By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

      c.    By giving false and pretextual reasons for the prices of Diisocyanates sold by them during the Class Period and by describing such pricing falsely as being the result of competitive factors rather than collusion.

81.     Price increases of Diisocyanates before and during the Class Period were not unusual. Plaintiff was thus conditioned by experience in dealing with the Defendants of what they believed to be a competitive industry to expect price increases from time to time.

82.     During the limitations period, each of the Defendants issued price increase

announcements that were distributed or published to Plaintiff and Class members, containing false and pretextual reasons for price increases for Diisocyanates. These price increases in fact resulted from Defendants' price-fixing conspiracy, rather than from the factors cited by Defendants.

83.     Defendants consistently ascribed their price increases to ordinary market forces and considerations, such as increased raw material costs, decreased sales volume, and decreased margins. Plaintiff and Class members did not have and could not have had, until shortly before commencement of this litigation, access to sufficient information to know that such explanations were false and pretextual.

84.     These and other false or misleading explanations for price increases on Diisocyanates lulled Plaintiff into believing that increases were the normal result of competitive market forces rather than the product of collusive efforts. Defendants' statements about the reasons for the price increases were designed to,

- 33 -

and did, put Plaintiff off guard and cause them to accept the increases without undertaking further inquiry.

85.    Plaintiff and Class members did not know, and could not have discovered through reasonable diligence, that Defendants' explanations for these increases in prices for Diisocyanates were false and pretextual until shortly before this litigation was commenced.

86.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class' claims have been tolled.

## 11.    Cause of action.
## Violation of Section One of The Sherman Act
### (On behalf of Plaintiff and Class)

87.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

88.    Defendants and unnamed coconspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section One of the Sherman Act (15 U.S.C. § 1).

89.    Beginning as early as January 1, 2015, and possibly earlier, and continuing through the present, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to

unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

90.     In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of Diisocyanates.

91.     As a result of Defendants' unlawful conduct, prices for Diisocyanates were raised, fixed, maintained, and stabilized in the United States.

92.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

93.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

> a.     exchanged information on prices charged for Diisocyanates;
>
> b.     agreed to raise, fix, and maintain prices for Diisocyanates;
>
> c.     raised, fixed, and maintained prices for Diisocyanates;
>
> d.     allocated markets for Diisocyanates; and
>
> e.     sold Diisocyanates throughout the U.S. at non-competitive

prices.

94.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for Diisocyanates than they otherwise would have paid in the absence of Defendants' unlawful conduct.

95.     The alleged contract, combination or conspiracy is a *per se* violation of the federal antitrust laws.

### Prayer for relief.

**Wherefore,** Plaintiff prays as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.     That Plaintiff and the Class be awarded prejudgment and postjudgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

E.      That Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

**Jury trial demand.**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this complaint so triable.

DATED: July 3, 2018                        Respectfully submitted,

*/s/ E. Powell Miller*_____
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, MI 48307
Tel: 248-841-2200
Fax: 248-652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

Steve W. Berman
Anthony D. Shapiro
Ronnie Seidel Spiegel
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eight Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
tony@hbsslaw.com
ronnie@hbsslaw.com

Jason A. Zweig
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 N. Cityfront Plaza Drive, #2410
Chicago, IL 60611
Tel: (708) 628-4958 Fax: (708) 628-4950
jasonz@hbsslaw.com

Michael E. Criden
Kevin Bruce Love
**CRIDEN & LOVE, P.A.**
7301 SW 57th Court, Suite 515
South Miami, Florida 33143
Tel: 305-357-9010
Fax: 305-357-9050
klove@cridenlove.com

Simon B Paris
Patrick Howard
**SALTZ MONGELUZZI BARRETT & BENDESKY PC**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel: 215-496-828
Fax: 215-496-0999
sparis@smbb.com
phoward@smbb.com

Daniel E. Gustafson
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com

Steven J. Greenfogel
**LITE DEPALMA GREENBERG LLC**
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel: 267-519-8306
Fax: 973-623-0858
sgreenfogel@litedepalma.com

*Attorneys for Plaintiff Isaac Industries, Inc.
and the proposed class*